Good morning. Good morning, Your Honors. May it please the Court. Parker Rider-Longmaid for Defendant Appellant Matthew Panuwat. I'd like to reserve three minutes for rebuttal and I'll watch the clock. All right. It's always aspirational, so I'll try to help you out. Thank you, Your Honor. I appreciate it. The key question here is the scope of the duty not to trade under Medivation's insider trading policy, which the SEC now agrees controls over any background duty. The most straightforward path is to hold that the district court made two errors that at minimum require a new trial. First, the jury instructions ensure that the jurors would not consider Medivation's policy. They told the jury that an employer is merely entrusting an employee with confidential information. That's not what the jury instruction says. So, Your Honor, I think the problem here is that both parties agree, and I would point the court to pages 26 to 27 of the SEC's brief, that what matters when there is an express contract like the insider trading policy here, those terms govern. And the SEC has also pointed to the Chamber of Commerce's amicus brief at pages 5 and 6, I believe, and 13 and 14, which make the same point. So that's common ground. The problem with the jury instructions here is that they said, they did say, an employee has a duty of trust, confidence, or confidentiality with regard to non-public information when he expressly agrees to maintain the confidentiality. But then they went on to say, and this is 2 ER 267, a duty also arises even in the absence of a written agreement when an employer entrusts an employee with confidential information. I think the key point for this point here is that the instruction said you could look at things beyond the insider trading policy, which now everyone agrees is what the jury will look at. Let me ask you this, because there's a lot here, right? It was a multi-week trial, which the jury, you know, returned a very verdict on. And I'm really focused on the procedural posture in which this case was tried, right? This issue that the policy language trumps all, and there shouldn't be any entrustment type of language, any implied duty that arises, was something that was not litigated before the district court. Is that fair to say? I don't think it is, Your Honor. I mean, I think the district court understood, so this is in the motion to dismiss ruling at 3 ER 401. Paniwat primarily contends that he did not breach his duty to medivation because the company's insider trading policy did not prohibit trading in Insight Securities. And then when there's, and of course the district court rejects that argument and says the district court said it thought that the SEC had the better argument. Then it went to the summary judgment posture, and at that point the judge decided that it was something that Mr. Paniwat could argue to the jury. He said regarding the dispute between the parties about whether the policy controls and the terms control, the district court wrote, Paniwat's argument to the contrary may persuade a jury, but it cannot prevail at summary judgment. That's at 3 ER 384. He said there are disputes of material fact whether the insider trading policy prohibited trades like Paniwat's Insight trade. And that's the next page, 3 ER at 385. Right, that's the express policy language on the trade, and I think the parties can dispute exactly what that says. You know, I think the district court thought that the plain language very much weighs in favor of the SEC, but at a minimum to the extent that the jury could accept a contrary reading. That's why the SEC didn't win on summary judgment. But I asked this question regarding the entrustment because that entrustment idea, I thought, and correct me if I'm wrong, was also proposed by Paniwat's own jury instructions. So I think and I went back and I'll lay out the cards because there's a lot here and you only have 15 minutes, but I went back and read portions of the closing argument. I didn't read the whole thing. Eventually I might have to get to that, but I read the portions of the closing instructions, closing arguments that were submitted as part of the excerpts of record. And this whole idea of duty and policy express language of the policy trumping any sort of implied duty was just nowhere in the picture. And the district court said that duty was essentially something that it was admitted to. The fight was on something else. Right. So you're on a few responses because I think to your point about how this is a certain procedural posture, the fight continued to happen all the way through the jury instructions. And at that point, when the jury instructions were baked and they were going to be given to say, there are two ways you can do this through the express policy or also through some entrustment theory. And at that point, of course, Mr. Paniwot's lawyers had to argue all the things they could argue to the jury. But I want to point you to a few different places. The instruction that Mr. Paniwot proposed, this is FER at 132, said in addition to the entrustment piece, you must also find that Mr. Paniwot had a duty to medivation not to use that material non-public information to purchase in-site securities. And we offered an instruction and this is at FER 154 to 155 that to look at, quote, the language of the policies, end quote. And we made the argument to the judge that if medivation did not through his company policies prohibit Mr. Paniwot from using the confidential information, there is no tenable argument for breach. So this is an issue that continued to come up through all the stages of pretrial motions practice and through the fight about the jury instructions and what the jury instructions would be. And then as your honor, I think alluded to, what the SEC was able to tell the jury in the closing statement is they pointed to this admission. I want to talk about that in a minute, but the point of the admission and said, because of that, quote, it's not even necessary to look at other potential sources of Mr. Paniwot's duty to medivation. The duty question was, quote, not seriously in dispute. Those are at 2 ER 283 to 84. And again, on the next page at 285 told the jury didn't even need to get to the policies. So the... But the jury instruction permitted them to look at the I think the SEC says that's essentially superfluous or surplus age in terms of instructions, but it's not because there's no reason that the jury would have looked at the policies that they say, okay, he has a duty because he received this information, right? Like there's plenty of evidence that he received this information. There was a dispute. We're not raising on appeal about materiality, but that was all there. So there really was no reason in terms of the way the case had been litigated before the jury to then look at the policies. And I think that was the So what I would point out about the admission, of course, is that, you know, the SEC says, and this is page 29 of the SEC's brief now, they recognize that Mr. Paniwot's subjective understanding is not dispositive in any event. And I would also point at this because, of course, duty is an objective question. We're not talking about say enter here. We're talking just about duty. And, you know, in addition, I mean, I think even if you look at what the admission was, it had to do with this. He understand he generally has a duty not to use information confidentially. But the problem here and what we, as we are arguing to this court, and it was pressed below that it has to be a specific duty not to trade in specific securities. And so you have this insider trading policy. And I think, as Your Honor alluded to before, there's a great dispute from the beginning about the scope of this insider trading policy. And I think I'm really making a modest ask of the court to say, at a minimum, you look at this insider trading policy and you see that it's reasonably susceptible to the two different readings. I mean, we think, in fact, that at best it's ambiguous. And then you would go to the rule of lenity and contra preferentum, and we can talk about why that would be. But at a bare minimum, and if you look at the California Supreme Court's decision in PG&E, and you look at this court's decision last April after the briefing, it was in the 20HA letters in San Bernardino, you have to look at extrinsic evidence about what meaning was intended by the language of a contract if that extrinsic evidence could show you that the language of the contract is reasonably susceptible to that meaning. And I think if we look at the policy... Well, I don't know that that helps you. If you look at the extrinsic evidence, I don't know that that helps you because it shows that the drafters knew what they were doing. And the fact that the business relationship is referenced in one provision, but nowhere referenced in the trading restrictions suggest that that was purposeful. I want to talk about... I think I want to make three points in response to that. One is how you might read this contract, and I think you must read it holistically, so in terms of how all these provisions fit together. And I think the other point would be, let's talk about what Dr. Hung and Kenneth, who is the CEO and founder, and then what Kenneth Guernsey, who was the outside counsel, would have testified and how it would have showed what a reasonable person could read the contract language to mean. So what you have when you look at the policy, right, is you have in the first paragraph of it, this is on 2 ER 82, there's a discussion of another publicly traded company including all significant collaborators, customers, partners, suppliers, or competitors of the company. If you then go down two pages later to 2 ER 84, where there are two different paragraphs, one refers to the continuation of those duties after someone leaves the company, and the other refers to the penalties that could be imposed, you know, under the policy. The penalties provision, which I think you would expect to be congruent with the prohibition, makes clear that it applies to medivation securities or securities of other public companies engaged in business transactions with medivation. So I think a reasonable person could look at this and say, okay, there are only going to be penalties if I'm trading in medivation securities or the securities of a company that has a significant business relationship with medivation, and I think you have to carry that language over and read the whole policy holistically and say, what does it actually prohibit? I mean, this is the other problem with it. I think we're talking about what the policy is reasonably susceptible. These policies have to be clear, and I would just point out that just taking a step back, I think one of the dangers of the SEC's view and affirming on the SEC's view is giving a license to companies not to be clear in their insider trading policies. These policies exist because you have to have clarity for employees about what is allowed and not allowed, and I would point out that Section 10B of the Exchange Act and SEC's Rule 10B-5, these are not all-purpose fairness guarantees. This is about, we're not talking about the classical theory. We're talking about the misappropriation theory. This is about ensuring that there is not a breach of a duty by the trader to the source of the information, and I think the problem here is that the source of the information is medivation. It's not the general public. This is not some question of fairness or what is good morality under the insider trading laws. The question is just, has there been a breach to medivation here, and on that point, I would, this is in the pretrial hearing on the motion in Lemonade. This is at FER 59-60. The judge, while ultimately excluding the evidence that I want to talk about, asked the SEC's lawyer, but do you see anything ironic in the SEC saying at the end of the day, this is what your policy means, when everybody else in the company thinks that there was no point in mentioning it because it's sort of a new theory? The problem here is the SEC is coming in after the fact and saying, this is how we read the policy. We think it unambiguously covers any publicly traded company, which, by the way, is a reading that would make all of those other provisions superfluous. It would make the including clause in the language that comes after it superfluous. It would make the specific language of the continuation provision and the penalties provision superfluous. It just doesn't mean anything if it applies to all different companies, and I think clarity is absolutely essential when you're talking about the power of the government to come in and impose civil or criminal penalties, and even short of civil or criminal penalties, to come in and use very powerful investigative tools, which we know can be very damaging. If you take the Dirks case from the Supreme Court in 1983, I mean, Dirks, eventually, the Supreme Court says he's not liable for anything. He was trying to help to expose a fraud. The problem is that clarity really matters. So I do submit that there is ambiguity here. You don't have to look at the extrinsic evidence. You can say there's ambiguity, and you have to use the rule of lenity. There are criminal penalties that are associated, not in this case, but in general, with breaching an insider trading policy like this because the government can charge it criminally. Policy means the same thing, whether it's applied criminally or civilly, so you have to apply the rule of lenity. Contra preferentum, as well, I'd point out that in the Sam Bernardino opinion that we've been talking about, what this court did in that case after finding that there was ambiguity was it applied the insurance context version of contra preferentum there and said the insurance company had drafted those policies, so it construe the ambiguity against Ixop or the insurance company in favor of the county. But here I think one of the huge process problems, fairness problems, is Mr. Paniwat was not allowed to bring in the testimony from Dr. Hung, the founder and CEO, and Kenneth Guernsey, the outside counsel. You're talking about the witnesses that that your side didn't call because the court required a foundation be laid? Your Honor, respectfully, the problem was that the district judge gave a very clear ruling, which he called later in the post-trial opinion an explicit limitation. And he said there, this is on 1 ER 32-33, that he chose to exclude this testimony. And in the motion in Lemonet ruling, which was clear and explicit, what he said was that these witnesses may not speak to the legal meaning of the policies, and that's at 3 ER 328. And I think that's just legal error, as we know from PG&E, and we know... Well, they didn't draft the policy, so if you could lay a foundation, I don't think the district court said that you couldn't call the witnesses, provided the right foundation could be laid. No, so Your Honor, the reason I think that's not right is because it was, as the court said, it was an explicit limitation that they could not speak about the legal meaning of the policies. And in fact, there was questioning, and this is it, this is not in the excerpts of record, but it's at docket 161 at 101. These were questions being asked of Jennifer Jarrett, who is the CFO of the company, and the question was, if Matt Paniwat did not use Medivation's confidential information to trade an insight, that would not be a violation of the policy, correct? And then there was an objection, because this would have called for the legal meaning, and the objection was sustained. The point was that these witnesses could not speak about the legal meaning of the policy. It was very explicit. This was a decision that the judge made after briefing on the motion in Lemonet, the SEC's motion in Lemonet, 12 pages of hearing transcript on it, which is at FER 53 to 65, and then the judge says you can't speak to this key issue. The judge said they could speak to other issues, like the enforcement of the policy and the like, but the key question here is the objective duty question. Is there any reason to think that the government's reading of the policy language and the duty it imposes is incorrect because Medivation saw it differently? And Your Honor's question about foundation, David Hung, Dr. David Hung, was the founder and CEO, in that sense authorized to speak for the company. And what he said is he, what he said during his deposition testimony when he was read the paragraph, he said it seems like it applies to publicly traded companies with which the company has business dealings. That would have been, that is exactly the kind of evidence, of course, that in San Bernardino. It's even better, because in San Bernardino, as we point out in the 20HA letter, these are statements that counsel for the insurance company, employees for the insurance company, are making decades after the about the policies in that case. Do you see my point about aspirational? Because you're not over time. But I know you wanted to save some time, so I'll put three minutes back on the clock. Thank you, Your Honor. Good morning, counsel. Good morning. May it please the court, David LaCitsa for the Securities and Exchange Commission. After an eight-day jury, after an eight-day trial, a jury... Speak up a little bit. Sure, sure. Or pull the microphone closer, perhaps. Okay. Is that the best medicine? Yes, thank you. Thank you. Okay. After an eight-day trial, a jury found the Panawat engaged in insider trading. Panawat expressly agreed not to use any of Medivation's material non-public information he obtained in his senior role to trade in Medivation securities or the securities of another publicly traded company, including its competitors. A jury found that he breached his duty of trust and confidence by using confidential information about Medivation's acquisition to trade in Insight, another publicly traded company and a significant competitor of Medivation. Is it your position that the insider trading policy language that's in the policy and be limited to trading in Medivation securities and securities with which Medivation has business dealings? I understand that your position is it can be read more broadly to say you can't trade in the securities of any other publicly traded company, but is your position that it can't be read the way that Panawat reads it? Well, I think that's a fallback argument. I think that our main argument is that it is unambiguous. I think... Unambiguous? Unambiguous. It prohibits trading in another publicly traded company on this information. And I don't think publicly traded company is a fragile term. It's a defined term. It's a legal term of art. People know what it means. I think that another problem with the business... I understand that. The problem is that you have to read it in context and all the rest of it is including the fact that what we're worried about is having access to this information from either Medivation or other publicly traded companies with which Medivation has business dealings. And because of your access to this information, you could profit from the trading in Medivation or other publicly traded companies. It seems like you would read those publicly traded companies to be the same ones that were mentioned earlier, especially when it goes on to say significant collaborators. What is your argument? I mean, this whole list is redundant. And then it's doubly redundant because why would you say that including significant collaborators, that would seem to indicate that insignificant collaborators are not included. But under your position, everybody's included. So your reading, I find... I mean, I think it makes more sense to me that their reading is the only plausible reading. In other words, it's not ambiguous, but it's not in a way that doesn't help you. But even assuming it's ambiguous, it just seems a real stretch to read this as not ambiguous and including all securities of another publicly traded company, unless you just only read that language and ignore all the language around it, which I assume that you would acknowledge that we shouldn't just... that we have to read language in context, correct? Yes. And so part of that context is the competitors. I think my friend's reading of business dealings makes the competitor superfluous as a real problem. Competitors rarely have business dealings or engage in business transactions. Why does it make competitors? Because competitors don't necessarily have business dealings, such that the two provisions can exist peacefully under his interpretation. So competitors don't have business dealings. You might have inside information about, you know, if it makes sense, you might have inside information about competitors because Medivation is trying to collect that information internally. And it's very, it's very, you know, Medivation knows that their competitor is about to do something because they're watching them like a hawk. And then you use that to make money off of their competitor, you know, about to release a new product or something. And you only know that because you're working at Medivation. I could see where Medivation would not want that to happen, right? You're basically making money off of Medivation's competitors' good fortune vis-a-vis Medivation. I don't see how that makes it superfluous. In fact, your argument is that it's unlikely they would. Unlikely doesn't mean superfluous. I mean, I appreciate your reading, but if it's that capacious, then it reaches inside as a competitor because that would be exactly what happened here, that there's information about how they compete in terms of drugs, talent. I mean, the problem is that, but it didn't, I mean, this is, your problem is it didn't matter whether they were a competitor under the, like, the jury, the jury didn't really have to consider whether they were a competitor at all because the jury was able to just say, well, it's everybody here. The judge in his order, in his summary judgment orders, said, and I quote, this is on ER, he said, this list is not exhaustive. The securities of another publicly traded company, including. So the judge, it seemed to me, had made like a, reached a, there's a bit of inconsistency because the judge had read this as creating a legal, you know, interpret it legally to mean anything broader than, than just Medivation and its business associates and people that did business with, but then later it said it could persuade a jury, but Medivation's argument that the jury didn't even need to conclude that, it kind of, it made it so it didn't make any sense for the, like, a jury here could basically just find Medivation, in fact, the jury didn't even look at the policy at all under the government's argument. So irrespective of what happened in summary judgment, there's conflicting testimony on whether they're competitors for the jury to consider and an instruction that says, consider the totality of the circumstances. As far as the argument about bypassing the agreement during closing argument, I don't, you know, I think that while the agreement is the best evidence and the strongest evidence of his duty, there was of course. Let's focus on one thing specifically here. So you say in your brief, and it seems like it's more than that. Well, the jury could have determined they were competitors, but the jury had no reason to consider whether they were competitors or not, never had a reason to get to that decision because the jury could conclude that it just included literally every publicly traded company. So I don't understand, if, tell me this, if I am, if I think that it has to be a, somebody with whom they have business dealings, then how can I accept your argument? Well, the jury may have thought that they had business dealings. How do we know that? Wouldn't that require us to send it back? No, I think that under the Harmus error review under Traver, and when you have a, when you have a supported, do you have general verdict under the express agreement where it may be even their competitors and supported by substantial evidence, then you affirm on that ground. But the jury could have reached this conclusion based on a legal, if you take the assumption I'm saying, that this is limited to significant, the jury could have reached, reached its conclusion applying the wrong law. And why wouldn't that require reversal? You're saying the jury, well, the jury might've reached the right legal interpretation, but we don't have any, we wouldn't have any confidence in that. I think there's an eternal factual basis for a finding on a single element. Is the answer that the jury wasn't told how to interpret the policy one way or the other? No, that's exactly right. And it was put before them in, in, in. There's a, as I understand it, and correct me if I'm wrong, the only way based on this policy that Panawat could prevail at this stage after having the case go to trial is if the policy unambiguously weighs in his favor, such that summary should have been granted on the duty question. I think that's right after a jury trial. Yeah, how can that be right? I don't understand because, because Medivation had, or Panawat had so many ways to lose here because they could lose by the jury concluding that the policy is not relevant at all. So I don't, so they could, because they don't even have to review the jury, review the policy under the judge's instructions. And then if they look at the policy, they could conclude, they could in theory conclude that the policy applies to Panawat because they're a competitor. That's your argument. Or they could, they could conclude that, that incentivize, is not a competitor, but that the policy is super broad. And so there's like at least three different legal routes to them losing. And I think you just answered Judge Nguyen that no, no, they, they, they only had one route. I think you're talking about different factual bases and that's how the trade war works. So you have a general verdict with different factual theories. We're talking about one element of one legal theory, a duty of trust and confidence and whether or not you reached it. That this question of duty and whether the express language can trump an implicit duty was not something that was ever briefed or argued. As I see it, the argument is that he's a very experienced trader, been doing it since high school, had been tracking this company, knew that they were under, undervalued and made the trade not based on non-public material, non-public information, but on his own assessment that the company was undervalued. That's the thrust of it. I, I don't know this whole entrustment idea, trumping the policy language. I didn't see that in this record argued to the district judge. So in fairness, the immediate question that comes to my mind is, okay, what was argued before the district judge? And is there a forfeiture question as the accuracy of the jury instruction here? No, I, I agree that that's the situation. I think entrustment, there's an invited error. I think also my friend overstates this idea of trumping. We agree that the agreements are the strongest evidence, but there was of course, additional evidence about his role as an employee, a senior executives, a core member of the acquisition team. So you didn't give up on that. You're not giving up on the whole second circuit case. What is that chess chessman case? Well, I don't think that Chessman is his legal argument that there's a problem. I think in your case, you have you have Clark and Talbot. You have also have Carpenter itself that says you can without the magic word of entrusts, it says, you know in the, even the absence of a written contract, an employee has a fiduciary obligation to protect confidential information obtained during the course of his employment. That's Carpenter in the Supreme Court. He repeated in Clark. He repeated essentially in Talbot and you have a totality of the circumstances instruction here. We still think the agreement is best. Closing arguments put that in front, in front of the I think maybe Judge Wynn was just saying that yeah, but the argument was still that this entrustment theory that's it's independent of the policy language. They never challenged it. I didn't see, did you in your brief rely on the entrustment theory at all before us? It seemed to me that you had retreated to at least before us arguments based on the policy language and the policy here. I didn't, I didn't see you relying independent of the policy. We win. No, I just, I want to just talk about an entrustment for a second. Entrustment is sort of a derogatory term that refers to a unilateral in terms of is there an employee? Do employees have their, have obligations as well? Yeah, we discussed his senior role on a brief on 56. We say the instruction appropriately directed the jury to evaluate the entirety of the business relationship between Panama and Medivation based on their express agreement and in light of his role as head of business development and core member of his acquisition team. I don't under, I think that they're overreading this trumping idea. I think you're right. This is not a Chessman situation where there's just a kinship. It's not a mere entrustment case because he's very high level in company given this information in order to help the company make the assessment and evaluation. So I think the more difficult question and the question on which I did not see an adequate challenge or briefing is in the face of an express policy whether that controls and that trumps any sort of implied duty that may arise from his employee-employer relationship. And that's the specific argument that I think is more difficult in this case. Right. And I didn't see that preserved. So what I'd say about that is that the evidence all points in the same direction. He had a duty of trust and confidence regarding this information. There's no conflict between the agreement and his obligation as an employee. The vice versa. The agreements reference his employment. The trade agreement says during the course of your employment. The confidential agreement says during the term of my employment. It's the first instruction here and it references employment. That's your argument. That's your argument which prevailed at summary judgment and also apparently prevailed before the jury given the way this was argued. His argument though, which I think is coming up for the one can debate whether that's a correct reading of the policy. But to the extent that that's his argument, that would trump any sort of implicit duty that may arise from the employment relationship. I mean, I just was that argument specifically argued below? No, I didn't. There was no reason below. The argument is that Pioneerwant, they didn't even try. And I'm asking, did you dispute? Are you disputing that? So, Judge Wins, focusing on, was that argument made below? And you're saying no in answer to that. And I guess we'll hear from your side on that. What I'm asking is with regard to that argument, it didn't seem to me that you were disputing that argument before us in your answering brief. I mean, you just pointed to something in your section about jury instructions, but you don't, I mean, you have a whole section that talks about before that, you know, it's 25 to page 47 and it's all about the language of the conduit. You seem to be relying completely on your interpretation of the insider policy. Is that, am I correct on that? Or are you relying on the fact that there was a duty separate and apart from the insider trading policy? I, what we are saying is that, can you answer? This is really important because I found your position very fuzzy, which is part of my whole problem with this whole case. I think the jury had a very fuzzy, just this guy did something bad. You can convict him, do it with the policy, do it with one reading, you could do with another reading, you can do without the policy. And that seems to be exactly what I'm hearing from you. So are you relying on, on the policy or are you saying even separate and apart from the policy has an independent duty before us? I'm saying that you rely on the policy as the strongest evidence, but in the totality of the evidence in this case, as the jury was instructed, you look also at his role and there's no contradiction between them. Okay, this is really important. You're out of time. What if there, I think there is a contradiction, which governs the policy or this general entrustment theory? I have to, I just don't understand the premise is that there's an entrustment problem. You don't understand that there could be a circumstance where there's this like general entrustment theory out there. The second circumstance is wrong, there's this general entrustment theory out there. And so you're, I assume you're familiar with that argument, that there's this general entrustment theory out there, right? And then you have a policy that says this policy is meant to supersede the general entrustment theory. This policy says there's no training, which one of those would control? Can you, can you policy around the general entrustment or not? I would, I would just say that the position is you don't need to decide that in terms of like the absence of an agreement. That's why I'm asking you and that's why I'm asking counsel, counsel, counsel, look at me a second, not your notes. If you don't mind, I'm asking you to assume for a second, assume that there is a conflict between the two, which one controls? What is your position on that? I just need to know. So if the agreement permits something that would be otherwise prohibited under an implied duty, and it is an agreement such that the, such that it is in a complete, you know, a complete explanation of what their discussion is, I think that you'd have to then consider like the district courts made an alternate holding that, in that the requisite trust of confidence can be based on providing him with confidential information as a function of his employment. At 1 ER 12 to 16, the district court relied on Clark and Talbot. No one is asking this court to overrule Clark or Talbot. The district court noted that the basis of that decision derived largely from agency principles. We're over time and you're not answering my question. You are over time. I'm not sure. I'm not sure that I quite got the answer either, but I understand your point that we may not need to reach it in this case. I appreciate the argument. Thank you. Thank you. Do you have any questions? I do. Actually, counsel, stand there for a second. Thank you, Judge Nguyen. Just one question, counsel. Is there evidence in the record that Medivation and Insight were engaged in business transactions? I think that the best evidence under a capacious reading would be yes, and I think I would point to that they had competed in the market for breast cancer drugs. Medivation had a drug called Telazeprib, and Panawat confirmed in a slide that he produced for the board that Insight, whether it was rumor or confirmed, he said Insight competed with Medivation to acquire Telazeprib. They bid for it. Ultimately, Medivation paid $410 million for it. That is for SER 76, and then also there is a testimony from the CFO who said it was understanding that Insight had competed with Medivation to acquire that drug. That's at 2 SER 291 to 292 and 303. So that would be a business transaction if you are bidding, and no one would say that someone who lost a bidding war and was also bidding had not been engaged in some transaction, business dealing, or a competitor. So I think that that would be probably the best evidence. I think also in terms of blood cancer, they were both competing, but in terms of a business deal, that would be it, the also a bidder, and that's what Panawat told the board. So that obviously was his understanding and something that would be prohibited expressly and unambiguously by the contract if they are competitors and having business dealings. Thank you. Thank you, counsel. Put three minutes on the clock, please. Thank you, Your Honor. Just a few points quickly. I do think the SEC has conceded in its brief that you look to the language of an express policy, and I just want to say why that makes sense, because there's some confusion in legal theories. If you look at O'Hagan, 521 U.S. at 659 note 9, the Supreme Court makes clear that the source of information can authorize certain trades. It's all a contractual question. We don't have much time, so if we assume that, what about Judge Wynn's question of, well, yeah, you never made this argument below. So I think we did, Your Honor, and we did talk about this before. Well, if you did, you wouldn't have proposed your own mere entrustment language. Your Honor, we didn't propose our own mere entrustment language. We proposed, and this is at FER 154 to 155. It also points to SCR 92, where we say that the jury has to look at the language of the policies, and we say, if Medivation did not, through its company policies, prohibit Mr. Pannuot from using the confidential information, there is no tenable argument for breach. I also think that it makes no sense. The whole argument throughout the— That's a slightly different argument than really the legal question of whether the implied duty can be completely trumped under your interpretation of the policy. Well, Your Honor, respectfully, I would say what happened was that the district court said, I'm going to send this to the jury. It was not hearing anymore about what the legal arguments were about it, and then said, having said this is a factual question, which he said, this is a question of material fact, excluded the evidence that would bear on that factual question about which meaning Medivation meant the policy to have legally. That's exactly how the extrinsic evidence rule in California works. They don't dispute that that's the governing law there. So what Mr. Pannuot was unable to do was to bring in these—would have been very significant witnesses to say, we didn't understand the policy to sweep that broadly. San Bernardino makes clear they don't have to be involved in drafting, but I would point out that Kenneth Guernsey was outside counsel at the time that the policy was amended when it was used here. Of course, Dr. Hung was CEO the whole way through. Kenneth Guernsey gave legal advice about the policy to the Medivation— I think that argument is hard for you to make if you didn't try to call the witness yourself. But let me ask you one final question, because you're down to a minute. You're now post a jury verdict, right? So if there's any evidence demonstrating that their competitors, such as competitors in the acquisition market, that would mean that you would lose, even assuming the district court's instruction was an error. I don't think that's right, Your Honor. It's the harmlessness question. They have to prove that the error is harmless. And so you have a jury question, and I think it was what we've been discussing. The jury didn't have to ask this question. We know the jury wasn't actually focused on this question. And we have— I don't know what the jury was focused on. It was a general verdict. Your Honor, we go through in the reply brief—I'm just looking at my time, pages 21 through 23—to show this is not significant evidence. It's certainly not significant competitor of any of this evidence, very speculative evidence. And we have in the record that was stipulated as authentic— Is that how the rule—and I apologize, but this is kind of important, because my understanding was that if you've given a jury a legally incorrect route to reach a verdict—but in theory, they could have had a legally proper route. And assume for a second that that's the case here. They could have found that they were competitors and that was legally—I'm not asking you to concede that, but assume that. But they also could have just ignored the policy language altogether and gone off on some Then my understanding was that since we don't know whether the jury would have picked the legally correct route or the legally incorrect route, we would need to send it back for a new trial if there was a legally correct route before them, but a legally incorrect route. There seems to be an assumption here that if there are several legally incorrect routes, but there's one legally correct route the jury could have taken, general verdict, you guys lose unless you can disprove all the—am I— No, no, Judge Van Dyke, I think what—I agree with what you said about needing to send it back for a new trial because you don't know and they have to prove that the error is harmless. And I just—this is a really important point. Keith Michelson, who was an Insight VP, there is deposition testimony that stipulated it came in. Authenticity was stipulated saying that they were not competitors. Insight and motivation did not satisfy any of these terms that we've been talking about. So there—we think we have a much stronger argument on whether there was a significant business relationship between the two. And as we've discussed, I don't think the jury had to make that decision. And the SEC encouraged the jury not to make that decision. And Judge Wynn, you were pointing out, reading through the opening and closing statements, I think if you look at the opening and closing statements, Penny Watts' counsel repeatedly argued, you know, you don't have this relationship. I don't think the jury thought about it for a second because they didn't have to. They just looked at his role. And on this point about Myron Trussman, you can forget Trussman. Yeah, I look at it only because the record is very dense. This was an eight-week trial. And, you know, when you look at kind of in little snapshots of issues before the appeal, it may not provide the full flavor of what was before the district court. So that's why I generally go back and try to look at the closing, especially when jury instructions are at issue. But I understand your argument. It's been very lively and very helpful to the court. And I appreciate counsel for both sides for coming into court and arguing it today. The matter is submitted. Thank you.
judges: NGUYEN, VANDYKE, Huie